I find myself unable to agree with the views expressed by the learned justice in the prevailing opinion that there was no evidence of negligence on part of the railroad company and that the death of the deceased was the result of his own negligence.
The uncontradicted testimony was that when cars were to be shunted during the night a brakeman was stationed on the leading car with a lantern. It appeared that in an early hour of the morning, when it was still dark, the crew of the cars to be shunted were at the ice house, some five in number, among whom were the deceased and the brakeman, Kathen, when orders were given to the deceased to go down and line up switch 16. This order was given in the presence of Kathen and the deceased. It was Kathen's duty to take a position on the leading car with a lantern while the cars were being shunted. Calvin Smith, who was the freight conductor in charge of the movement of the cars, gave the orders. He testified on this point: "I was instructed by the yardmaster to have a man on the rear end of the train backing down from the ice house at all times" with a lantern. "We never backed down from the ice house to sixteen switch without a man on the rear." *Page 245 
And on cross-examination the witness further testified to the effect that before the deceased went down to throw the switch and before the movement was made Kathen was present with his lantern lit and knew of the proposed movement of the cars. Now, the undisputed fact is that Kathen somehow or other disappeared and there was no man stationed on the rear of the car with a lantern to give warning during the movement which resulted in Kemp's death.
The prevailing opinion assumes, without any testimony which would fairly support such assumption, that the brakeman with a lantern was stationed on the leading car not for the purpose of warning a switchman who was sent and in the line of his duty went to set a switch and who, of course, knew that a particular train of cars was to be shunted onto a particular track, but only for the purpose of giving warning to members of the public who might be in the railroad yard or some other railroad employe not engaged in the movement. Members of the public would be trespassers in the yard, to whom the railroad company would not owe any duty except to refrain from doing willful injury, unless they were especially invited there by one who was authorized to do so. The supposition that any member of the public might be in the railroad yard during the night time is so unsubstantial as to probability that it precludes the notion that the object of a brakeman on a leading car was to protect the public.
The obvious purpose of stationing a brakeman with a lantern on the leading car was manifestly for the purpose of protecting those persons who had a right to be in the railroad yard, irrespective of their knowledge that trains were being moved and shunted down the tracks. Knowledge of the fact that a train of cars is to be shunted can only be properly considered on the question whether there was an assumption of the risk by the employe or person injured of the particular danger in being upon or in crossing the track upon which the movement of the train is to take place.
The learned writer of the prevailing opinion says:
"There is no evidence in the case which shows any custom that one possessed of the knowledge of Kemp as to the proposed *Page 246 
movement of the train should be further warned. There was then no duty on the part of the railroad company to have, so far as Kemp was concerned, a brakeman on the leading car. If the railroad company was under no such duty then it was not negligent in its relation to Kemp, and the trial court was justified in nonsuiting the plaintiff on the ground of failure of proof of negligence, as negligence must be proved under the Federal Employers' Liability act to recover damages."
The fallaciousness of this reasoning is the direct consequence of overlooking the fact that Kemp's knowledge of the movement of the train was fortified by the further knowledge that the moving train would have a brakeman stationed on the leading car with a lantern, so that the approach of the train could be discerned in the dark by him.
The fact that Kemp had knowledge that the train was to be moved can have no proper bearing on the question whether or not the conduct of the conductor, in sending down the cars without the brakeman with a lantern, was a negligent act, but such conduct might have a bearing on the question whether or not Kemp, by his negligence, contributed to his injury and death, which, of course, is no bar to a right of recovery under the federal statute.
Now, if common prudence dictated that in order to protect the lives of its employes a brakeman with a lantern should be stationed on the leading car, the failure to do so would be negligence. But if this care or caution is not adopted by the employer, the employes who work with the knowledge of such dangerous conditions take the risk of injury flowing therefrom. But it is a novel and startling proposition that a negligent act may be such as to one class of persons and non-negligent under like circumstances to another. I can readily conceive that a negligent act may be actionable as to one class of persons and not to another. A master's negligent act does not become a non-negligent act because a servant who has knowledge of his master's negligent conduct prefers to remain in his service and work at machinery which both *Page 247 
master and servant knew was out of repair and in a dangerous condition. The servant, if injured, would be held to have assumed the risk of injury resulting from his master's negligence, whereas if a servant were put to work at the same machinery without any knowledge of its defective condition, and was injured, he would be entitled to recover upon the ground of negligence.
In the present case the act of sending down the train was not in itself negligent conduct. The negligence consisted in moving the train without a brakeman on the leading car, as a lookout with a lantern, so that any employe of the company would be apprized of the approach of the train.
The view of the majority of the court as expressed in the opinion is that conceding the failure of the defendant to have stationed a brakeman with a lantern on the leading car was negligent conduct, yet, nevertheless, the judgment of nonsuit can be properly and is sustained upon the controlling circumstance, that is, there was not "under the evidence any negligence of the defendant shown which was as a matter of law the proximate cause of Kemp's death."
Beven, in volume one of his admirable work on "Negligence" (atp. 93), under the caption of "Causal Connection," says: "What is a proxima causa, or immediate cause in law, is a matter so largely dependent on the facts of the individual case that any formula of the general principle seems unattainable."
Proximate cause is ordinarily a mixed question of law and fact, as in the case here. The conductor of the moving train testified that on the morning in question a brakeman stationed on the leading car would have had a view of two hundred feet ahead of him, and that at the rate of speed the train was moving it could, upon signal given, have been stopped within forty feet. Now, under such a state of facts a jury would have been warranted in finding the proximate cause of plaintiff's decedent being run over and killed was the failure of the defendant to have a brakeman, with a lantern on the leading car, which would have been an indication *Page 248 
to the decedent that the train was moving, its position on the tracks, its nearness or remoteness from the place where the decedent was, and, furthermore, that a brakeman, in the proper discharge of his duty could have observed, by the light of his lantern, in ample time, the whereabouts of the decedent, and thus have stopped the train and avoided the accident.
It is said that the conductor's act did not put Kemp in peril. Whether it did or not was a jury not a court question, under the circumstances of the case. The prevailing opinion then says: "Kemp knew the train was coming on the track on which he was standing. He knew if he remained on the track he would be struck. He had ample time to leave the track and place himself in a place of safety. After he threw the switch it was his subsequent reckless conduct in remaining upon the track in disregard of his own safety, when he knew the train was coming, which was the sole and proximate cause of the accident resulting in his death. Without Kemp's independent intervening human agency in either determining to remain in a place of danger or in omitting to remove himself from his dangerous position no harm could have happened to him from what was done."
This is clearly a non sequitur; for when Kemp discovered that he was in peril from an object moving towards him in the dark it might very well have been that he made an effort to save himself, but was too late.
A tort-feasor who creates a peril which suddenly overtakes and injures one cannot escape the consequences of such wrongful act upon the plea that the party injured might by the use of safer means have avoided the mishap. And even if I am wrong in this, nevertheless, the question whether the injured party could have avoided his hurt by the exercise of reasonable care would be a jury and not a court question.
It seems to me that the court is here assuming a function which strictly belonged to the jury. There was not a spark of testimony which tended to show under what circumstances Kemp met with his death. The only circumstance upon *Page 249 
which the excerpt of the opinion of the majority is based is that Kemp's body was found in a mangled condition a rail length — about seventy feet east of the switch, "one of his legs, one of his arms and the lower part of his body laid in the middle of track sixteen," "about a rail length from the frog, east of the frog, and the upper part of his body and his head and one arm laid in between sixteen and seventeen."
While it is true that Kemp knew a train would be coming on track sixteen he was not expected to know that it would steal upon him along in the dark without a light and a lookout. It is a pure surmise that he was standing on the track when struck. It is consistent with the surrounding circumstances that Kemp, not seeing any train approaching, walked not on track sixteen, but between tracks sixteen and seventeen, to ascertain what caused the delay, at least a jury might have properly drawn such an inference, for it was more than fifteen minutes after Kemp had gone to throw the switch that the train was started on its journey. It is also a mere surmise that Kemp had ample time if he observed the train to reach a place of safety. It is assumed, without any testimony to support the assumption, that Kemp's duty ended when he threw the switch. Ordinarily, after a switch has been opened it is the duty of the switchman to see that it is closed, for the failure to do so might lead to disastrous consequences to other trains with their human freight, using the tracks, operated by the switch.
It is further said that without Kemp's independent intervening human agency, as shown by his conduct, no harm could have come to him. Of course, if he had not been there he could not have been hit. Under the doctrine enunciated no person could recover for injuries through the negligence of another, no matter how prudent or careful his conduct, so long as he was an independent intervening human agency. If his conduct was careless or reckless and such conduct co-operated with the negligent act of the defendant he would be guilty of contributory negligence, which is no bar to the action. To hold that the defendant was free from negligence and that it was Kemp's negligence which was the sole producing *Page 250 
cause is to assume without the slightest proof that he willfully placed himself upon the tracks of the defendant for a suicidal purpose.
The law upon that subject as settled in this state is: "No presumption of negligence in the decedent arises in any such action from the mere occurrence of the accident. The facts and circumstances as a basis for nonsuit must be of such probative force, in the evidence of the plaintiff, that contributory negligence so conclusively appears as to exclude any other legitimate inference or conclusion. The facts and circumstances, where they are of doubtful import, and difficulty arises as to the solution of the question whether contributory negligence exists or not, are for the consideration and determination of the jury." Pennsylvania Railroad Co. v. Middleton, 57 N.J.L. 155; Suburban Electric Co. v. Nugent, 58 Id. 658.
The burden rested upon the defendant to establish that the plaintiff's intestate was guilty of negligence which was the sole producing cause, which under the facts and circumstances of this case presented a jury question. It is a fair and reasonable inference from the testimony that if there had been stationed a brakeman, with a lantern, on the leading car, Kemp would not have met with his injury and death, and that it was this omission of duty on part of the defendant's servant which was the producing cause of the accident.
The question of assumption of risk, though discussed in the briefs of counsel, is not touched upon in the prevailing opinion, and the reason for this seems plain. It cannot be said, with any show of reason, that Kemp assumed a risk of danger which was not obvious or made known to him. He was at the ice house when Kathen was there with his lantern, and whose duty it was to take his position upon the leading car. Kemp had the right to expect that this duty would be performed and that the train would not be sent down unless so equipped. The moving of the train without a brakeman with a lantern on the leading car was negligence which was unexpected and unforeseen by Kemp, and this case therefore falls within the control of Reed, Administratrix of the Estate *Page 251 of Leo C. Reed, deceased, v. Director General of Railroads, 258 U.S. Sup. Ct. 92, 96; 66 L.Ed. 480, and, therefore, the judgment of nonsuit should be reversed.
For affirmance — THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, GARDNER, JJ. 9.
For reversal — KALISCH, ACKERSON, VAN BUSKIRK, JJ. 3.